THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.  2:09CV00029 DS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM DECISION |
| | ) | AND ORDER |
| | ) | |
| $85,688.00 in United Sates Currency, | ) | |
| Defendant, | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| ANDREW C. WILEY, | ) | |
| | ) | |
| Claimant. | ) | |

_____

### I.  INTRODUCTION

The United States filed this forfeiture action against currency found in a motor vehicle driven by Andrew C. Wiley after a traffic stop on September 15, 2008.  Mr. Wiley has filed a claim for the currency.

Alleging that his Fourth Amendment rights were violated, Mr. Wiley has moved to suppress all evidence obtained as a result of the traffic stop of his vehicle.  He also moves to have this case dismissed and the Defendant Property returned to him.  An evidentiary hearing was held, followed by post hearing briefing.

The relevant facts are these.  On September 15, 2008, Mr. Wiley was driving a 2002 Toyota Tundra pickup truck westbound on I-80 near Salt Lake City, Utah.  At 10.06 a.m. Utah Highway Patrol

Trooper Chamberlian Neff stopped him because when he ran a search on the vehicle's Missouri license plate the registration didn't return as being on file. When dispatch ran the plate the result was the same.

Trooper Neff approached the passenger side door. The passenger window was rolled down only three or four inches. Because Trooper Neff was having difficulty communicating with Mr. Wiley he asked if he could open the passenger door. Trooper Neff asked Mr. Wiley for his license and inquired where he was off to today and other small talk. He then asked Mr. Wiley to grab his license and registration and instructed him to come back to the patrol car.

Mr. Wiley was directed to sit in the front seat of Trooper Neff's patrol car. Trooper Neff informed him that he stopped his vehicle because when he ran the vehicle's license plate it did not return on file. Mr. Wiley stated that he had just bought the vehicle.

Mr. Wiley produced a driver's license, a Missouri Motor Vehicle Title Receipt which showed that he had recently purchased the vehicle for $5,000., and a GEICO EVIDENCE OF INSURANCE document which identified the insured vehicle as a 1999 Honda Accord. Mr. Wiley said it was the current policy for the truck. Mr. Wiley did not have a vehicle registration for the truck.

During the time the two were in the patrol car, Trooper Neff

engaged Mr. Wiley in conversation about the vehicle registration and Mr. Wiley's travel plans.  Mr. Wiley said that he had just purchased the vehicle and that he was on his way to Los Angeles, California to visit friends and his aging aunt and to assist his aunt with some chores.

Mr. Wiley stated that he had left Missouri on Saturday, September 13, 2009, and drove westbound on I-70 into Colorado and then north to I-80 westbound.  When Trooper Neff informed him that he could have saved a day in travel time by continuing on I-70 to get to Los Angeles, Mr. Wiley stated that I-80 was a beautiful drive and he wanted to go that route.

In response to questions by Trooper Neff, Mr. Wiley stated that he was between jobs and his parents had given him about $1,000 for the trip.  When asked how he could afford to purchase a new truck without a job, Mr. Wiley explained that his family was helping him.  Trooper Neff believed the truck to be a new vehicle and that value of the truck was greater than the $5,000 purchase price.  When pressed about the cost in gas for an extra day of travel due to taking I-80, Mr. Wiley said he had his family helping him out.

When asked if he had ever been arrested, Mr. Wiley stated that he had been arrested a long time ago for DUI.

When Trooper Neff asked for the telephone number of the aunt Mr. Wiley was visiting in Los Angeles, he didn't hesitate and

appeared to retrieve from his cell phone address book that number and the number of the friend he said he intended to stay with. Dispatch subsequently placed calls to those numbers but could not get in touch with either person.

In response to his inquiries, dispatch relayed to Trooper Neff that the truck was not reported stolen, but a valid registration did not return on file. Dispatch further reported that Mr. Wiley had a valid driver's license and no outstanding warrants. Dispatch also reported that Mr. Wiley had been previously arrested for possession of marijuana and drug paraphernalia. When asked about those charges, Mr Wiley stated something to the effect that he had been on probation for the DUI and the paraphernalia but the marijuana charge was not supposed to be included in the plea.

Trooper Neff returned the requested documents to Mr. Wiley, then asked for the vehicle information again and returned to the truck to verify and compare the VIN on the title receipt to those on the truck. He returned to his patrol car, verified that he had returned Mr. Wiley's license, and told him to travel safely.

After Mr. Wiley exited the patrol car, Trooper Neff approached him, asking if he could talk to him some more about his trip. Mr. Wiley said no and Trooper Neff communicated that he was not free to leave and that he was suspected of criminal activity. Trooper Neff further questioned Mr. Wiley regarding whether he was doing

anything illegal, and whether he had any drugs, weapons or large amounts of cash in the vehicle. Mr. Wiley responded no to each question.

Trooper Neff directed Mr. Wiley to stand at the front of the vehicle and off to the side of the highway while he ran his drug dog around the outside of the truck. Mr. Wiley responded by saying no, that he needed to leave. Trooper Neff stated that based on his suspicion of criminal activity he was going to detain Mr. Wiley. A Canine search was conducted with Tank the drug dog who was in the back of Trooper Neff's patrol car. Tank the drug dog alerted to an area or areas of the truck for the presence of drugs.

Approximately 20 minutes elapsed from the time Mr. Wiley was stopped until Tank alerted to drugs in Mr. Wiley's vehicle.

A search of the truck revealed the currency at issue here, a small amount of marijuana and rolling papers.

## II. DISCUSSION

**A. Warrantless Search and Seizure.**

Mr. Wiley assets that the traffic stop was both an unlawful pretext stop at its inception[1] as well as an illegal detention.

---

[1] In support of his pretext position Mr. Wiley relies in part on a standard no longer valid in this Circuit. *See United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995), *cert. denied*, 518 U.S. 1007 (1996)(overruling *United States v. Guzman* 864 F.2d 1512 (10th Cir. 1988), cited by Mr. Wiley in support of his position that the traffic stop was nothing more than a pretext stop).

Traffic stops are seizures within the meaning of the Fourth Amendment, which protects citizens from unreasonable searches and seizures. *United States v. White*, 584 F.3d 935, 944-45 (10th Cir. 2009). "A routine traffic stop constitutes an investigative detention and is examined under the principles announced in *Terry v. Ohio*, 392 U.S. 1, 19-20 ... (1968)". *United States v. Williams*, 403 F. 3d 1203, 1206 (10th Cir. 2005). The court makes a two step inquiry when addressing the reasonableness of an investigative stop. The first inquiry is "whether the stop was justified at its inception." *Id*. The second inquiry is "whether the officer's conduct during the detention was reasonably related in scope to the circumstances which justified the initial stop." *Id*.

### 1. The Initial Stop

Mr. Wiley asserts that Trooper Neff had no reasonable articulable suspicion that a traffic or equipment violation had occurred and, therefore, the initial stop was impermissible.

"A traffic stop is justified at its inception if an officer has (1)probable cause to believe a traffic violation has occurred, or (2)a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir.), *cert. denied*, 129 S.Ct. 2881 (2009). The officer's subjective motives are irrelevant and the Court examines only

whether the stop was objectively justified. *White*, 584 F.3d at 945.

During a routine traffic stop, an officer may request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings. *Untied States v. Williams*, 271 F.3d 1262, 1267-68 (10th Cir. 2001). And an officer may ask questions unrelated to the reason for the stop as long as the questioning does not extend the length of the detention. *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006).

Trooper Neff testified that he stopped Mr. Wiley after running his Missouri license plate and learning that there was no return of a registration on file. That suggested to him that there was a possible violation because the license plate did return as being registered.[2] The Court concludes, therefore, that the stop of Mr.

---

[2] Mr. Wiley was not cited for a registration violation. Nevertheless, Utah law, although not discussed by either party in the briefing, can be interpreted as lending support to Trooper Neff's suspicion that there was a registration violation. Unless exempt, a person may not operate a vehicle in Utah without it being registered. Utah Code Ann. § 41-1a-201. Vehicles registered in other states are exempt. *Id*. at § 41-1a-202(2)(a). Here, however, Trooper Neff could find no valid registration on file for the vehicle. Arguably, therefore, the exemption did not apply. *See United States v. Rios*, 88 F.3d 867, 872 (10th Cir. 1996)(although Utah exempts out-of-state vehicles from registration statute, because out-of-state vehicle was not properly registered in another state, the exemption did not apply and, therefore, vehicle was not properly registered under Utah law and was subject to impoundment).

Wiley was justified at its inception and finds that the traffic stop was valid and legal based on reasonable suspicion of a motor vehicle violation.

### 2. Scope of the Stop

"'In addition to being justified at its inception, a lawful traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place. A seizure that is justified solely by the interest in issuing a warning ticket to the driver may become unlawful if it is prolonged beyond the time reasonably required to complete that mission.'" *White*, 584 F.3d at 949 (quoting *United States v. Lyons*, 510 F.3d 1225, 1236 (10th cir. 2007)). However, "'[t]he traffic stop may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* (quoting *United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009)). The Court considers the totality of the circumstances in deciding whether an officer had acquired reasonable suspicion of other criminal activity. *Id*. at 950. "'[T]he level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence or that required for probable cause.'" *Id* (quoting *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir.), *cert. denied*, 129 S. Ct.

2418 (2009)). And a factor that by itself is not proof of illegal conduct and is consistent with innocent travel, may nevertheless raise objectively reasonable suspicions. *Id*. However, "'unparticularized hunches' based on indicators 'so innocent or susceptible to varying interpretations as to be innocuous' cannot justify a prolonged traffic stop or vehicle search." *Id*. (citation omitted).

Examined separately, none of the "red-flag" indicators identified by Trooper Neff would support a conclusion that his suspicions were objectively reasonable. *See e.g. United States v. Wood*, 106 F.3d 942 (10th cir. 1997) However, considered together under the totality of circumstances, as the Court must, the Court concludes that Trooper Neff had an objectively reasonable suspicion that Mr. Wiley was involved in criminal drug trafficking activity, to warrant further detention.[3]

### a. implausible travel plans

Mr. Wiley told Trooper Neff that he was unemployed and driving to Los Angeles from Missouri to help his aging aunt and to visit friends. He said he elected to leave I-70, a more direct route, in favor of I-80, an indirect and much longer route to Los Angeles, because he had been told that it was a beautiful drive.

---

[3] *See United States v. Arvizu*, 534 U.S. 266, 273 (2002)(subsequent to *Wood*, the Court reemphasized that reviewing courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."

Trooper Neff testified that he was suspicious of Mr. Wiley's explanation because I-80 would not take him anywhere near where he said he was going, and because in his experience [4], driving on I-80 for no other reason than it is a beautiful drive was suspicious. Trooper Neff was also suspicious because I-80 is the direct route to San Francisco and northern California which, he knew from training, is a prime growing area for high-grade marijuana for which I-80 is the west to east transportation route.

Trooper Neff further testified that people traveling across country that are involved in criminal activity often state that they are going to aid an elderly or sick relative in order to ingratiate themselves with law enforcement and to appear to be cooperative and friendly.  Neither the Aunt or a friend identified as living in Los Angeles were able to be reached  when the numbers Mr. Wiley provided were dialed by dispatch in order to verify Mr. Wiley's story.

---

[4] At the time of his encounter with Mr. Wiley, Trooper Neff had been a member of the Utah Highway Patrol for approximately 3 years and was a member of the criminal interdiction team.  He had received in-service training classes taught by senior troopers on red flag indicators of criminal activity.  He also attended a week-long Desert Snow course sponsored by Rocky Mountain HIDTA where he was trained in advanced highway criminal interdiction, including typical indicators of criminal activity.  In addition prior to the day of the encounter, multiple times a day  he would consult a secure law enforcement website "black Asphalt" to learn of what other officers have experienced and learned from conducting traffic stops, including red flag indicators of criminal conduct.  He was also a canine handler and certified with his dog in narcotics detection.

"[I]mplausible travel plans can form a basis for reasonable suspicion." *White*, 584 F.3d at 951. When considered under the totality of circumstances, Trooper Neff's suspicions regarding Mr. Wiley's travel plans were objectively reasonable.

### b. arrest record

When asked if he had ever been arrested, Mr. Wiley told Trooper Neff that he was arrested for a DUI a long time ago. Dispatch, however, relayed that Mr. Wiley had been previously arrested for possession of marijuana and drug paraphernalia.

"'[I]n conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus.'" *White,* 584 F.3d at 951 (quoting *United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005)). Because Mr. Wiley was not truthful with him, and combined with other factors, Trooper Neff was reasonable in his suspicion that Mr. Wiley was involved in criminal activity.

### c. appearance and contents of vehicle interior

Trooper Neff observed that Mr. Wiley's vehicle had a "lived-in" look. There were hanging shirts, open luggage-type bags behind the seat of the truck and discarded wrappers. Trooper Neff testified that based on his training and experience, the motoring public traveling across country in pursuit of innocent activities will periodically stop and tidy up their vehicle. He saw a can of Febreze in the vehicle, which he testified can be used to mask the

odor of drugs.  He also could see an energy drink and a coffee cup, which in his experience are used by people transporting drugs in order to stay awake for long periods.  He also saw packaging for a cell phone charger.  Trooper Neff testified that the packaging indicated to him that this was a newly purchased item, and he typically sees such items being used to charge prepaid or disposable cell phones.  Additionally, Trooper Neff testified that when he approached the passenger side window of the truck, Mr Wiley rolled down the window only three to four inches, which he believed could be to hide the odor of any drugs or to keep him from clearly seeing the interior of the vehicle.

The Court acknowledges that these factors standing alone, have little significance.  However, when taken together with the other indicators observed, they can be viewed as supportive of the reasonableness of Trooper Neff's suspicion of criminal activity.

### d.  miscellaneous factors

Trooper Neff perceived, erroneously, that the vehicle was new and worth more than the price Mr. Wiley reported having paid.[5]  He testified that in his training and experience, drug organizations provide newly purchased vehicles for low prices and register those vehicles in the name of the driver.

---

[5] In fact, the vehicle was a 2002 model with approximately 67,700 miles on it.

Mr. Wiley's unemployment also triggered suspicion. Trooper Neff testified that in his experience, a large percentage of those trafficking in narcotics are unemployed.

Finally, Mr. Wiley's level of nervousness seemed unusual to Trooper Neff, who testified that Mr. Wiley's hands were shanking during the time they were in the patrol car together and when he was fumbling through his phone. *See White*, 584 F.3d at 950 ("this court will consider an officer's observation of nervousness, and particularly extreme nervousness, in weighing the totality of the information available to the officer").

### e. totality of the circumstances

Based on Trooper Neff's testimony, and the other evidence presented, the Court finds that Trooper Neff had an objectively reasonable suspicion that Mr. Wiley was involved in criminal activity involving drug trafficking. That suspicion warranted Mr. Wiley's further detention beyond the investigation of the traffic stop.[6]

---

[6]It also is noteworthy that because Trooper Neff had a certified drug dog with him in his patrol car, the time to do a canine sniff around Mr. Wiley's vehicle was minimal. *See United States v. $49,000.00*, 208 Fed. Appx. 651, 656 (10th Cir. 2006)(contrasting that case with *United States v. Wood*, 106 F.3d 942 (10th Cir. 1997), court observed "we would note that, unlike the present case, the officer who stopped Wood did not have a dog with him and had to have the dog brought from outside to the scene of the stop [whereas] {t]he 'detention' in the instant case was said to be only two to three minutes"). Approximately only twenty minutes elapsed from the time Mr. Wiley was stopped until Tank alerted to the presence of drugs in the truck.

### III. CONCLUSION

For the reasons stated, Mr. Wiley's Motion to Suppress Evidence (Doc. #29) is denied.[7]

IT IS SO ORDERED.

DATED this 25th day of March, 2010.

BY THE COURT:

*David Sam*

DAVID SAM
SENIOR JUDGE
UNITED STATES DISTRICT COURT

---

[7] The Court denies Mr. Wiley's Requests to Take Judicial Notice (Doc. #44 & Doc. #46) for generally the same reasons outlined by the United States in its Objection (Doc. #47).